## Case No. 4,960.

Ex parte FOSTER.[1]

[2 Story, 131;[2] 5 Law Rep. 55.]

Circuit Court, D. Massachusetts. April 30, 1842.

---

[1] See Ex parte Abree, 3 Ves. 82, 83.

[2] [Reported by William W. Story, Esq.]

STORY, Circuit Justice. This is the case of an application by Foster, a petitioner for the benefit of the bankrupt act of 1841, c. 9, against William Appleton and others, who were severally attaching creditors, some of whose attachments were made upon his personal estate and others upon his effects in the hands of his debtors under the trustee process, before the date of the petition, Fos-

ter not having as yet been declared a bankrupt, because the time has not yet arrived, when the petition is to be heard in the district court. The petition, which is on the equity side of the court, seeks relief against these attachments by a decree of the district court, for an injunction enjoining the creditors from further proceedings against the property attached, and requiring them to surrender these attachments, or for an injunction and other relief against these attaching creditors, according to the view, which the court shall take of the matter. The discussion has taken a very wide range, and the questions arising in the case have been argued with great ability and learning. In the view, which I have taken of the questions, I do not deem it necessary to go into a minute examination of the weight and bearing of the numerous authorities cited at the bar, some of which certainly seem open to much juridical criticism and doubt, from the looseness of the language used, as well as from the extraordinary nature and extent of some of the propositions asserted in them. And, after all, the questions must mainly depend for their decision upon the true character and effect of an attachment upon mesne process under the laws of Massachusetts, and the extent to which such an attachment is recognized and protected, or is maintainable under the bankrupt act of 1841, c. 9, either by the express savings of the act, or by the policy and general provisions thereof. The attachments under the trustee process must be governed by similar considerations, and therefore they will require no separate notice.

Before proceeding to consider the questions, which have been argued, I wish to say a few words as to the jurisdiction of the district court in the premises. And here I lay it down as a general principle, that the district court is possessed of the full jurisdiction of a court of equity, over the whole subject-matters which may arise in bankruptcy, and is authorized by summary proceedings to administer all the relief which a court of equity could administer under the like circumstances, upon a regular bill and regular proceedings, instituted by competent parties. In this respect, the act of congress, for wise purposes, has conferred a more wide and liberal jurisdiction upon the courts of the United States than the lord chancellor, sitting in bankruptcy, was authorized to exercise. In short, whatever he might properly do, sitting in bankruptcy, or sitting in the court of chancery, under his general equity jurisdiction, the courts of the United States are by the act of 1841 competent to do. So that the question resolves itself, so far as the exercise of jurisdiction for relief in this case is concerned, into this, whether it is a fit case for interposition and relief by a court of equity.

Having disposed of this preliminary mat-ter, let us now proceed to the consideration of the questions raised at the bar. And in the first place, what is the nature and effect of the common writ of attachment, as mesne process (for the case which I mean here to consider is that of William Appleton, by an attachment upon mesne process, and not of the other attaching creditors and trustees, under the foreign attachment act), under the laws of Massachusetts. It contains a command to the sheriff, or other proper officer, to attach the goods or estate of the defendant, and for want thereof, to take his body. The officer is at liberty, under that precept, to take the goods and chattels, or the lands and other hereditaments of the defendant, or both, to answer the exigency of the writ. If the officer attaches the goods and chattels of the defendant, he takes them into his possession, and they are then deemed to be in custody of the law, and are to remain under his care and possession, to abide the final judgment in the suit. If lands or other hereditaments are attached, they are not taken possession of by the officer; but they are bound by the attachment from the time, when it is made, if all the regular proceedings are had. And in such a case, the creditor is at liberty, if he obtains judgment in the suit, to levy his execution upon the goods and chattels, or lands, or either of them, until he has obtained satisfaction; and his attachment gives him a priority of right of satisfaction, out of the property attached, over all other creditors, for thirty days after his judgment, and no longer. If the judgment is for the defendant, the attachment is forthwith dissolved by mere operation of law. Such is the general character and operation of the common process of attachment (for I need not go into minor particulars); and by the very language of the laws of Massachusetts, the property so attached, whether real or personal, is "held as security to satisfy such judgment as the plaintiff may recover." Rev. St. 1836, pt. 3, tit. 2, c. 90, §§ 23, 24. But whether it be such a security, as is within the savings of the bankrupt act of 1841, c. 9, is quite a different question, and will come more directly under consideration hereafter. The supreme judicial court of Massachusetts have (as I think) taken the true view of it, in the case of Atlas Bank v. Nahant Bank, 23 Pick. 488, where they declared, that an "attachment on mesne process is to be considered as a remedy merely given and regulated by law, to enable one creditor, who is proceeding for himself alone, to obtain satisfaction of his debt; and when several are so proceeding, he who is first in time is prior in right." But the court immediately adds: "But in equity, all these priorities give way to a general proceeding which has for its object to distribute all the effects of a debtor, by paying the whole, if there be assets, and then proceeding for a ratable

distribution. If the property turn out to be sufficient to pay the whole, any priority by attachment would be useless; if not, it would be unjust." Now, this latter language is exceedingly pointed, and applicable to the case now before the court; for the bankrupt act has for its object and policy a distribution of all the assets of the debtor equally among all his creditors; and it positively prohibits any preference to be made by the debtor in favor of any creditor, in contemplation of bankruptcy. And hence a commission and decree, declaring a man to be a bankrupt, has been emphatically said to be a statute execution for all the creditors. See Barker v. Goodair, 11 Ves. 78–80; Cook, Bankr. Law (Ed. 1799) p. 5, c. 1; Twiss v. Mussey, 1 Atk. 67; Ex parte Knott, 11 Ves 608, 619.

But it is said, that an attachment under our law constitutes a lien upon the property attached; that it is a perfect, fixed, and vested lien, as much so as a lien by a mortgage upon personal estate; that it gives a vested interest in the real estate attached, so that the creditor may dispute the validity of a will thereof; and that it is deemed equivalent to a title by purchase for a valuable consideration. And certain authorities are relied on to establish and confirm these positions. One of these authorities, I own, is very direct to the position, that an attaching creditor of real estate has a right to contest the validity of a will of that estate before he has obtained judgment, and levied his execution thereon; that is, before it is ascertained, whether he has any debt due to him, or any right to make an attachment. If this be so, I can only say, that I am unable exactly to comprehend the grounds of the decision, and how to it solely as a decision founded upon the local law, that is binding upon this court. But I must treat it as an exception to the general rule, and I am not called upon to give it a more enlarged operation. It seems to stand (as may be respectfully submitted) upon the very verge of the law, inter apices juris; and may enable any stranger, however remote, and without any just debt or claim, by a mere attachment, to interpose himself as a party to contest the most solemn and well-authenticated will. It asserts directly, that a creditor acquires an interest in real estate by a mere attachment, although never consummated by a judgment, and although he may never levy thereon, nor indeed have any right to levy thereon. It appears to me, that most, if not all, the other cases cited at the bar, have been pressed beyond their fair and reasonable bearing, into the service of the argument, at least since the alterations of our law under the provisions of the Revised Statutes of 1836.

It is true, as asserted at the bar, that an attachment upon mesne process is constantly spoken of in our Reports as a lien; and doubtless it is so, in a very general sense of

the term, adopted by way of analogy and illustration, rather than from a very exact resemblance, which it bears to liens, generally recognized, as such, at the common law, or in equity, or in maritime jurisprudence. But, as has been truly said by Lord Coke, no simile holds in every thing ("Nullum simile quatuor pedibus currit"). Co. Litt. 3a. Lord Tenterden has said, that the word "lien," in its proper sense, in the law of England, imports that the party is in possession of the thing which he claims to detain; and that where there is no possession, actual or constructive, there can be no lien. Abb. Shipp. (Am. Ed. 1829) p. 171, pt. 3, c. 1, § 7; Id. (6th Ed., by Shea, 1840), p. 220, pt. 4, c. 1, § 8; 1 Story, Eq. Jur. § 506; 2 Story, Eq. Jur. §§ 1215–1254. And this is generally true, perhaps universally true at the common law, independently of statutable provisions, or of special contract. The doctrine was explicitly asserted by Mr. Justice Buller in delivering his opinion in the great case of Lickbarrow v. Mason (before the house of lords) 6 East, 21, note; Id. 25,—where he says: "Liens exist at law only in cases where the party entitled to them has the possession of the goods; and if he once part with the possession after the lien attaches, the lien is gone." Mr. Justice Grose, in delivering the opinion of the court in Hammonds v. Barclay, 2 East, 227, 235, said: "A lien is a right in one man to retain that which is in his possession, belonging to another, till certain demands of him, the person in possession, are satisfied." The same thing has been often insisted upon by other judges. Wilson v. Balfour, 2 Camp. 579; Ex parte Heywood, 2 Rose, 355; Heywood v. Waring, 4 Camp. 291; Gladstone v. Birley, 2 Mer. 404; Hallet v. Bousfield, 18 Ves. 188; Giles v. Grover, 6 Bligh (N. S.) 340. But in the maritime law, liens are recognized, independently of possession, actual or constructive; such as in cases of seamen's wages, and bottomry bonds and liens by material-men upon foreign ships. But in such cases, there is no pretence of a vested lien, until the labor or service is complete, or the voyage ended, and the contract become absolute. Until that period, it is merely inchoate, and conditional, and imperfect. In equity, also, liens exist independent of possession, either actual or constructive; as, for example, the lien of a vendor on the land for the unpaid purchase-money. But it has been long the established doctrine in equity, that a lien is not, in strictness, either a jus in re, or a jus ad rem; that is, it is not a property in the thing itself, nor does it constitute a right of action for the thing. It more properly constitutes a charge upon the thing. See Brace v. Duchess of Marlborough, 2 P. Wms. 491; 1 Story, Eq. Jur. § 506; 2 Story, Eq. Jur. §§ 1215, 1216, and the cases there cited; Ex parte Knott, 11 Ves. 617; Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386, 441, 442. It is, therefore, at most a simple right to possess and retain property until some charge attaching to it is paid or dis-

charged; or a mere right to maintain a suit in rem to enforce payment of the charge. Id. Mr. Justice Buller, speaking of liens at the common law, is equally expressive. He says: "Liens are not founded on property; but they necessarily suppose the property to be in some other person, and not in him, who sets up the right. They are qualified rights." Lickbarrow v. Mason, 6 East, note, pp. 21, 24.

Now, an attachment does not come up to the exact definition, or meaning of a lien, either in the general sense of the common law, or in that of the maritime law, or in that of equity jurisprudence. Not in that of the common law, because the creditor is not in possession of the property; but it is in custodiâ legis, if personal property; if real property, it is not a fixed and vested charge, but it is a contingent, conditional charge, until the judgment and levy. Not in the sense of the maritime law, which does not recognize or enforce any claim as a lien, until it has become absolute, fixed, and vested. Not in that of equity jurisprudence; for there a lien is not a jus in re, or a jus ad rem. It is but a charge upon the thing, and then only, when it has, in like manner, become absolute, fixed, and vested. In truth it bears a closer resemblance to the lien created by a judgment upon the real estate of the debtor. But that is only a general lien or charge over all the real estate of the debtor, to be enforced by an elegit, or other legal process, upon such part of the real estate of the debtor as the creditor may elect. And it is not a common law lien; for it had its origin in the statute of 2 Westm. (13 Edw. I. Stat. 1, c. 18), giving the right to an elegit. But there is, however, this strong and clear distinction between the case of a lien by judgment, and a lien by an attachment, that the former takes place only when the debt is ascertained and fixed by the judgment; whereas the latter is before the debt is ascertained, and is altogether future, and contingent upon a judgment being rendered in the suit in favor of the creditor. Yet a judgment creditor has never been held in England to have any interest in the land; but only a sort of pre-emptive right or lien to acquire it by an extent upon an elegit; and then his title relates back to the time of the judgment, so as to cut down all intermediate incumbrances, sales, and other puisne titles. Yet a judgment creates no interest in the land; and therefore, though the creditor should release all his right to the land, he might extend it afterwards. Brace v. Duchess of Marlborough. 2 P. Wms. 491. It was very justly observed by the master of rolls (Sir Joseph Jekyll) in Brace v. Duchess of Marlborough, Id., that all that the creditor has by the judgment, is but a mere lien upon the land; but non constat, that he will ever make use thereof. If, then, a lien be not in the sense of the law, founded in property; if it be not an interest in property, nor even a jus

ad rem; upon what ground can it be argued, that it is equivalent to a mortgage or a pledge? In the former of those cases, the immediate right and title to the general property passes at law to the mortgagee, who becomes and is the positive owner, liable to have it devested by a condition subsequent. In the latter, a special property passes to the pledgee, accompanied and conferred by the possession thereof. There is no ground to assert either of these considerations to be true in respect to the lien of an attaching creditor. The possession is not in him to any intent or for any purpose. The property of the debtor is not devested; and the possession thereof is in the attaching officer, holding it sub modo, and merely as bailee, for the purposes of the law; that is, the possession is in custodiâ legis.

The nature and character of a lien on lands, created by a judgment, were very fully expounded by the supreme court of the United States, in the case of Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386, 441, 443; and, on that occasion, the court took the distinction between the rights acquired by a mortgage, and those acquired by a judgment; and, among other things, said: "Now it is not understood that a general lien, by judgment on land, constitutes, per se, a property, or right, in the land itself. It only confers a right to levy on the same, to the exclusion of other adverse interests, subsequent to the judgment; and when the levy is actually made on the same, the title of the creditor for this purpose relates back to the time of his judgment, so as to cut out intermediate incumbrances. But, subject to this, the debtor has full power to sell, or otherwise dispose of the land. His title to it is not devested or transferred by the judgment to the judgment creditor. It may be levied upon by any other creditor, who is entitled to hold it against every other person except such judgment creditor: and even against him, unless he consummates his title by a levy on the land, under his judgment. In that event, the prior levy is, as to him, void; and the creditor loses all right under it. The case stands, in this respect, precisely upon the same ground as any other defective levy, or sale. The title to the land does not pass under it. In short, a judgment creditor has no jus in re, but a mere power to make his general lien effectual, by following up the steps of the law, and consummating his judgment by an execution and levy on the land. If the debtor should sell the estate, he has no right to follow the proceeds of the sale into the hands of the vendor or vendee; or to claim the purchase-money in the hands of the latter. It is not like the case where the goods of a person have been tortiously taken and sold and he can trace the proceeds, and waiving the tort, chooses to claim the latter. The only remedy of the judgment creditor is against the thing itself, by making that a specific

title which was before a general lien. He can only claim the proceeds of the sale of the land, when it has been sold on his own execution, and ought to be applied to its satisfaction."

The case of an attaching creditor is not near so strong as that of a judgment creditor, who has obtained a fieri facias, under which the sheriff has actually seized the goods of the judgment debtor to satisfy the same. And yet in this very case, it is perfectly clear, that before a sale, the general property of the debtor is not devested, and that the creditor does not, under the levy upon the fieri facias, acquire any interest or right in the property. The subject underwent a very elaborate consideration of all the judges, in the case of Giles v. Grover, 6 Bligh (N. S.) 279, where the main question was, whether the crown, upon an exeat issuing on behalf of the crown, after a levy on the goods of the crown debtor, under a fieri facias, against him in favor of a private creditor, but before a sale under the fieri facias, was entitled to a priority of satisfaction before the private creditor, or not. It was held by all the judges, who delivered their opinions in the house of lords (except Mr. Justice Gaselee and Mr. Justice Littledale) that it did. The two latter judges held the contrary opinion. But upon that occasion, all the learned judges concurred in opinion, that the general property of the debtor in the goods was not devested by the levy on the fieri facias, but only when a sale thereof had taken place; that the creditor had no interest or title whatsoever, nor even a lien in the property; but, at most, that the sheriff had, for his own protection, merely a special property, (as some of the judges thought), or a lien, (as others thought), or (as a majority of the judges thought), that the goods were in the custody of the law, and the sheriff held them as bailee, and in that character virtute officii. Lord Chief Justice Tindal has expressed the true position of the sheriff, in delivering his opinion in the case above cited, in the house of lords. Speaking of the case of the goods seized under the fieri facias before the sale, he said: "The goods are not sold; they are only on the way to be sold. It would be a better definition of the sheriff's relation to these goods, to say, he has them in his custody, under a power to sell them, than any actual interest or property in them. His situation, indeed, cannot be better defined, than by saying, the goods are in custodiâ legis, a phrase, which plainly distinguishes a mere custody and guardianship of the goods from a change of property; so far, therefore, as a special property in the goods is necessary for their safe custody against wrong-doers, and to render the execution of his public duty useful to the judgment creditor, so far he may be said to have property. But beyond this, as against the rights of adverse claimants, there is no authority for saying, that he has any prop-

erty at all." Lord Tenterden, in the same case said: "It has been argued that the property is vested in the sheriff, because there are authorities to show, that the sheriff, if the property be taken out of his hand, may maintain an action of trover against the wrong-doer. Now, actions are maintainable upon a ground perfectly distinct from the right of property. They are maintainable upon the ground of possession. Any man in the possession of goods, whether as bailee, or otherwise, may, in his own name, maintain an action. The power, therefore, of bringing an action of this kind, does by no means prove, that the property is in the sheriff." His lordship immediately added: "It is supposed by some, that the property is in the judgment creditor. But it is perfectly clear, upon consideration of the subject, that the judgment creditor has no property in the goods, while they remain in the hands of the sheriff. If the sheriff executes the process of the court, and serves a bill of sale to the plaintiff in the action, then the judgment creditor obtains the property; but until that is done, while the goods are in the possession of the sheriff, they are in the custody of the law, but still remain the property of the debtor, to whom they originally belonged." This last doctrine, that the creditor has no property by the seizure, was (as has been already stated) unanimously affirmed by all the judges; and the doctrine, maintained by Lord Chief Justice Tindal and Lord Tenterden, and the majority of the judges, was adopted by the house of lords. See Giles v. Grover, 6 Bligh (N. S.) 289–292; Id. 312–314, 317–319, 322; Id. 333–341; Id. 367, 368, 371, 372; Id. 374–376, 384; Id. 404–406; Id. 421, 431. Mr. Justice Patterson said: "The goods are in substance in custodiâ legis; the seizure made by the officer of the law is for the benefit of those who are by law entitled. It is made against the will of the debtor, and no property is transferred, by any act of his, to the sheriff. In this respect it differs from all cases of special property, and of charges on goods, created by the debtor, while he has the absolute dominion over the goods." Id. pp. 292–317. Here we see clearly stated the distinction between a title by conveyance, or contract of the debtor, and a seizure under process of law. In confirmation of this view, Mr. Baron Alderson said: "The true description of the state of the property is, that it is in the custody of the law where, as in the case of the factor, wharfinger, pawnee, or equitable mortgagee, it is in the custody of the party himself, being a beneficial interest under a valid contract." Id. p. 318. Lord Chief Justice Tindal took notice of the same distinction between the case of a seizure in execution, and goods being pledged, or lands mortgaged; that the one amounted to an alienation of the property pro tanto, the other gave only an inchoate claim on the goods; or, to use his own expression, the goods "are on their way to be sold." Id. p. 437.

Mr. Justice Taunton, in answer to the argument urged at the bar, that by the seizure on the execution, the judgment creditor had a lien on the goods, or a special property therein, and, therefore, that the crown could only take, subject to that lien or special property, peremptorily denied the doctrine; and said, "This special property is in the sheriff, not as trustee for the judgment creditor; but for the purpose of his own protection. Neither had the judgment creditor in this instance any lien on the goods." Id. p. 340. And he added: "How can the doctrine of lien to retain these goods be applied to this judgment creditor, who had no possession; the goods being in the possession of the sheriff?" Id. 341. And again, in answer to the argument, that the judgment creditor had by the seizure at least a security for his debt, he admitted that, as it had been stated by the court, in Morland v. Pellatt, 8 Barn. & C. 822; but immediately added (what is most important to be here noticed) that "the security may be vested and certain, or it may be contingent and defeasible. It does not necessarily import present property, nor even beneficial interest." "A jus tertii might interpose, and destroy it." Gilb. Exch. Pr. 89. The truth is, that goods were, at the common law, bound from the teste of the writ of execution, whether it was a levari facias, or a fieri facias, because otherwise the debtor, by an alienation of the chattels, might disappoint the execution. Giles v. Grover, 6 Bligh (N. S.) 315, 316; Id. 367, 435, 436. But this has been since altered by statute, so that on a levari facias, or fieri facias, the goods are bound only from the time of the delivery of the execution to the sheriff; and as to real estate, it is bound for the time of the judgment, upon the construction of the statute of Westminster. Id.; Lowthal v. Tonkins, 2 Eq. Cas. Abr. 381; Smallcomb v. Cross, 1 Ld. Raym. 251; Philips v. Thompson, 3 Lev. 191; Payne v. Drewe, 4 East, 523. When therefore, the word lien is used in cases of this sort, it is used in a peculiar and general sense, and indicates no more, than that the goods or lands are bound by the judgment, and not that the judgment creditor has any interest or property therein. As to the goods, they are bound only from the delivery of the execution to the sheriff, as against the debtor himself; but still a sale by him in market overt would be good.

I have dwelt the more upon these authorities, because if they present, as I think they do, the true state of the law, even in the case of a seizure under execution, they necessarily apply with vastly greater force to the case of a mere attachment, which, at most, can be no more than a contingent, conditional, lien or security, to satisfy the judgment of the creditor, if he ever obtains one; whereas, on an execution, the debt has been already ascertained and fixed by the judgment. Nor do I think that the decisions in the Massachusetts Reports (except that of Smith v. Bradstreet, 16 Pick. 264), construing them reasonably, and with reference to the case before the court, inculcate a different doctrine. In the very case of Grosvenor v. Gold, 9 Mass. 209, 210, Mr. Justice Sedgwick admitted the lien by an attachment to be merely a conditional security. He said: "By an attachment the plaintiff has a lien upon the subject provisionally, that is, to the amount of the judgment he may finally recover." In Denny v. Willard, 11 Pick. 524, Mr. Justice Morton, in delivering the opinion of the court, said: "The special property (after the attachment) was in the officer making the attachment, unless he had lost the lien by giving up the possession to the general owner." In Fettyplace v. Dutch, 13 Pick. 388, 392, the court said, that an attachment constitutes a lien; but the general property remains in the owner, subject to that lien; and he may sell the same subject to the lien. In Arnold v. Brown, 24 Pick. 89, 95, the court said: "An attachment constitutes a mere lien on the property, and the general owner may as well sell, subject to that lien, as any other. The effect of the sale will be to pass the general property, incumbered by the attachment. If that be extinguished by the settlement or failure of the suit, or the neglect to levy an execution in thirty days after the judgment, the sale of the property will become absolute, and the purchaser will hold it free of the incumbrance." Now, here we have admitted, in the most explicit terms, that the lien or security, call it whichever you may, is merely conditional, and depends upon the event of the suit. It is not a present, fixed, vested interest in any one; and certainly not in the creditor.

But it has been said, that in cases of foreign attachment under the custom of London, the attaching creditor had a lien or pledge of the goods attached in the hands of the garnishee; and although they were but a pledge to draw the defendant to answer, yet that before the statute of 21 Jac. I. c. 19, § 9, it was deemed such a security of the debt, that if the defendant became bankrupt after the attachment, and before the recovery of judgment, the commissioners could not take or assign the goods, except subject to the lien and security of the attaching creditor. For this position great reliance is placed upon Goodinge on the Bankrupt Law (1726 Ed. p. 107). Now, I know of no authority for that position; and the case of Bingly v. Warcop, 3 Keb. 480, cited by Goodinge in his text, does not support it; nor, as far as I can trace it in the Reports, has any such doctrine ever been established by the courts of law in the construction of the statute of Jac. I. c. 19, § 9, although that clause of the statute has on various occasions received ample commentary from the courts. Its construction was a good deal considered in the case of Giles v. Grover, 6

Bligh (N. S.) 277; and, indeed the whole train of reasoning in that case is against the doctrine. If it be true, that a foreign attachment is but process to draw the party to answer, still, if he does not appear and answer, or give security, the suit proceeds against the garnishee. The truth is, that a foreign attachment is like a common attachment on mesne process, as the supreme judicial court of Massachusetts have declared it to be, a remedy, merely given and regulated by law, to enable a creditor to obtain satisfaction of his debt (Atlas Bank v. Nahant Bank, 23 Pick. 488); and, like every other remedy, it is liable to be defeated by any act, that bars or takes away the remedy or right to judgment under it. Ever since the statute of Jac. I. c. 19, there could be no possible doubt; for that defeated all executions not actually executed, as well as all foreign attachments, after the act of bankruptcy, if a commission issued thereon, down to the latest statute in England. The policy, therefore, upon this subject, for at least two hundred years, has been uniform; and I doubt not was so from the earliest period of the bankrupt laws.

I have gone over the grounds thus suggested, not because my judgment rests upon them, but because they were mainly relied upon at the argument to support the title of the attaching creditor, and to defeat the petition. My judgment turns, however, upon other and distinct grounds. Assuming, for the purposes of the argument, that the attachment constitutes a lien or security to or for the benefit of the attaching creditor, still it is but a contingent or conditional lien or security, arising under a mere remedial process, and, therefore, the question must still remain for consideration, whether it is such a lien or security, as is within the savings of the bankrupt act of 1841. And if it be within the savings, then there still remains the ulterior question, whether the attaching creditor has a right to go on, without any interposition of the district court, sitting as a court of equity in bankruptcy, and obtain a judgment in his suit, before the bankrupt can obtain his discharge, which discharge, if obtained before a trial, would constitute a complete bar to the suit; and thus the attaching creditor, by a race of diligence, be allowed to obtain and to complete a preference in violation of the whole policy of the bankrupt act, which is an equal distribution of the assets among all the creditors.

Now, the saving, in the second section of the bankrupt act of 1841, which has been pressed so much at the argument, is in the following words: "That nothing in this act contained shall be construed to annul, destroy, or impair any lawful rights of married women or minors, or any liens, mortgages, or other securities on property real or personal, which may be valid by the laws of the states respectively, and which are not inconsistent with the provisions of the second and

fifth sections of this act." Now, certainly, the natural interpretation of these words "liens, mortgages, and other securities on property real or personal," would seem to be, that they referred to things of a like nature; or, as the maxim of law is, each may be known from its associates ("Noscitur a sociis"). The words may all be perfectly satisfied by treating them, as referring to liens fixed and vested in the party by a consummate title, such as liens by contract, resting on possession, or absolute by law, such as pledges, and not merely inchoate and conditional liens, dependent upon a mere remedial process. The term "securities" follows "mortgages," which are clearly vested rights under the grant of the party, defeasible only upon a future fulfilment of some condition subsequent. Securities of this nature may be by a deposit of title deeds, or conditional assignments of choses in action or the lien of a vendor for unpaid purchase-money. If we look back to the words of the enacting clause of this same section, to which the saving is appended as a proviso, we shall see, that there, the enumeration is confined to "securities, conveyances, or transfers of property or agreements made or given" by the bankrupt for the purpose of giving a preference or priority of a creditor, or indorser, or surety, &c. over the general creditors, and which are therefore declared fraudulent. Now, the natural inference certainly would seem to be, that the proviso is carved out of the enacting clause, and saves things ejusdem generis. The fifth section, to which also reference is made in the proviso, provides for an equal distribution of all the bankrupt's effects among all his creditors, with one or two exceptions, unimportant of this connection; and it declares, that creditors, proving their debts under the bankruptcy shall be deemed thereby to have waived all right of action therefor, and all unsatisfied judgments obtained thereon. So that the policy of the act, as to an equal distribution, is here made most manifest and positive. The 14th section of the act contains a provision, that the assignee may redeem, under the order of the court, "any mortgage or other pledge or deposite or lien upon any property real or personal, whether payable in presenti, or at a future day, and to tender a due performance of the conditions thereof." The words "mortgage or other pledge, or deposite or lien" in this clause clearly can mean nothing else, than such as arise from contract, and are of a present, fixed, vested, and ascertainable value. And it would be impossible to strain them, so as to include liens or securities by an attachment upon mesne process or other remedial process. And yet they certainly reflect great light upon the meaning of the like words in the proviso of the second section. But I do not propose to rest my present judgment upon any construction of the words, limiting them, so as to exclude in-

choate, conditional liens, arising, not under contract, but under remedial mesne process. Assuming such liens to be within the protection of the proviso (which is an admission, which I make merely for the sake of argument, and I am by no means satisfied, that it is a correct exposition of the words or intent thereof), still there remains behind a much more grave and pressing difficulty, to which I have heard no sufficient answer at the bar:

It is conceded on all sides, that unless the attaching creditor obtains a judgment in his favor in the suit, his attachment is gone. It is plain, therefore, that it gives no absolute right of any sort. It merely puts the remedy in progress. It is to my mind as perfectly clear and incontrovertible, that if the bankrupt, before any trial or judgment in that suit, obtains a discharge, that discharge is by the express terms of the bankrupt act (section 4), a full and complete discharge from all his debts provable under the bankruptcy, of which the debt sued for must be one; and of course, that it is pleadable as a bar to that very suit of the attaching creditor, in the nature of a plea puis darrien continuance. There is another provision in the third section of the act equally important to be considered, namely, that from the time of the decree in bankruptcy, all property and rights of property, of every name and nature, of the bankrupt, are devested out of the bankrupt, and become vested in the assignee upon his appointment; and it is further declared, "that all suits in law or in equity then pending, in which such bankrupt is a party, may be prosecuted and defended by such assignee to its final conclusion in the same way and with the same effect, as they might have been by such bankrupt." And it goes on further to provide that "the assignee so appointed shall be vested with all the rights, titles, powers, and authorities to sell, manage, and dispose of the property and rights of property of the bankrupt, and to sue for and defend the same, &c., as fully to all intents and purposes, as if the same were vested in or might be exercised by such bankrupt before or at the time of his bankruptcy declared as aforesaid." The act, therefore, manifestly contemplates, that as to all property and rights of property of the bankrupt, and as to all suits in law or equity pending, in which the bankrupt is a party, the bankrupt is to be treated, as if he were civiliter mortuus, and all his property and rights of property were vested in the assignee, as his executor or administrator. The moment that the decree in bankruptcy is passed, it relates back, for all the purposes of the act, to the time of the petition; and as soon as the assignee is appointed, all the rights, titles, powers, and authorities of the bankrupt vest in him by relation from the same period. How then, pending the proceedings in bankruptcy, before or after the decree, can the attaching creditor be permitted to go on with his suit, and proceed to trial and judgment, when there is, and can be, no party properly before the court to appear and defend the suit? If the attaching creditor had knowledge of the facts, it would be a fraud upon the bankrupt act for him to proceed in his suit, and to get a judgment before an assignee was appointed, or was in a situation to appear and defend the suit. Nor could the court, where the process should be pending, properly proceed in the cause, until it had been ascertained, whether the bankrupt was entitled to, and had received his discharge or not. If the bankrupt should receive his discharge, he would be instantly entitled to plead it in bar of the suit. And if the attaching creditor should forthwith proceed to judgment without waiting for the time when such discharge would or might be obtained, and be properly pleaded, either by the bankrupt, or by the assignee, or by both, in bar of further proceedings in the suit, and should obtain satisfaction of his judgment, I do not perceive, how, consistently with the principles of a court of equity, the creditor could be entitled to enforce the judgment, or to hold the money. The judgment must, to all intents and purposes, be treated as a fraud upon the bankrupt act, and as intended to defeat the just rights of the other creditors of the bankrupt.

It is precisely in this view, that it has struck me during the whole course of the argument, that no attaching creditor could be thus permitted by a court of equity, by a mere race of diligence, while the bankrupt proceedings were in progress, to overreach, and defeat the just rights of the other creditors, or the right of the bankrupt, if entitled to a discharge, to plead the same in bar of a judgment in the suit. I agree, that the court ought not to dissolve the attachment, or to take away the inchoate rights of the creditor to the security thereof, until it is ascertained by a decree, whether the party is a bankrupt, and whether he is entitled to a discharge from his debts. The court may, and, indeed, ought to allow the proceedings to be entered in the proper court, and to be continued, if the creditor elects so to do, until the discharge is obtained; but not to proceed in the mean time to trial or judgment; for if the petitioner should never be declared a bankrupt, or should not obtain any discharge, it may be, that there may be a judgment against him in personam, even supposing, (which I do not decide), that, in such an event, the attachment would be gone by the operation of the bankrupt act of 1841. But if a discharge should be obtained, I can entertain no doubt, that no judgment whatsoever could be had in the suit against the bankrupt, and that he and the assignee might each plead the discharge in bar of further proceedings. It strikes me, therefore, as perfectly clear, that, under such circumstances, it is the duty of the district court, as a court of equity, sitting

in bankruptcy, in order to prevent irreparable mischiefs, and the defeating of the true objects and policy of the act, to interpose by way of injunction to control the attaching creditor from proceeding further in his suit, than is necessary to protect his ulterior rights, and that he must act in the suit under the direction of the district court in the premises. See Ex parte D'Obree, 8 Ves. 82.

There is no novelty in this course. On the contrary, it is the common course in all cases, where upon the application of any creditor, or of an administrator or executor, a court of equity takes upon itself the administration of the assets of a deceased debtor. As soon as the decree for the administration is passed by the court, taking upon itself the administration of the assets, the executor, or administrator, or any creditor, is entitled to an injunction to prevent any other of the creditors from suing the executor or administrator at law, or further proceeding in any suit, already commenced, except under the direction and control of the court of equity, by which the decree is passed; for, under such circumstances, the court will not suffer a race of diligence by different creditors, each striving for an undue mastery, or preference, or priority of payment out of the assets, to prejudice the rights of the others. Jeremy. Eq. Jur. bk. 3, pt. 2, pp. 538–543, c. 5; 1 Story, Eq. Jur. § 549, and note 3; 2 Story, Eq. Jur. § 890; Drew. Inj. pt. 1, pp. 109–122, c. 4, §§ 2–7; Thompson v. Brown, 4 Johns. Ch. 619; Lee v. Park, 1 Keen, 714; Kenyon v. Worthington. 2 Dickens, 668; Brooks v. Reynolds, 1 Brown, Ch. 183. The decree in such a case is treated as a judgment for all the creditors. But it is not necessary to put it upon that ground; for when once the administration of the assets is taken by the court upon itself, as a matter of duty, it must be of course, that it cannot and ought not to permit any creditor to defeat, or to obstruct, or to interfere, with its own proceedings. Now this is precisely the situation of the district court, as to proceedings in bankruptcy, after a decree in bankruptcy. The court necessarily takes upon itself the administration of all the assets; and it is its duty to protect the property against all claims of creditors, which are inconsistent with the objects and policy of the act. I have no doubt, therefore, that it is the duty of the district court to issue an injunction in this case to the attaching creditor, directing him not to proceed in his suit, except under the order and direction of the court, until it shall be ascertained, whether there is a decree in bankruptcy, and a discharge of the bankrupt, which may be pleaded in bar of further proceedings. If, indeed, I entertained any doubt upon this subject, (which I certainly do not) I should not entertain any doubt as to the jurisdiction of the circuit court upon a bill, filed by the assignee, after his appointment, to overhaul

and control, or set aside all the proceedings, had in the intermediate time by the attaching creditor against the rights of the other creditors, and in subversion of the policy and objects of the bankrupt act of 1841. It would, therefore, after all, be but a postponement of the evil day, and a mere change from the equity jurisdiction of one court to the like jurisdiction of another court having full authority to act in the premises. It appears to me, that the reasoning of the supreme judicial court of Massachusetts in Atlas Bank v. Nahant Bank, 23 Pick. 480, is very strong in favor of the doctrine, which I hold upon this subject.

In the opinion here expressed I have not thought it necessary to advert to cases, where the right of the United States to a priority of satisfaction would attach under the laws of the United States. I have no doubt, that that priority would overreach any attachment under mesne process by any private creditor in a case of bankruptcy of the debtor. But it has seemed to me better to rest the whole case upon general principles, applicable to all cases of creditors.

It was asked, at the argument, what is to be done, as to the costs already incurred under the attachments? I answer unhesitatingly that all the costs already incurred are to be borne by the bankrupt's estate; for they must be deemed to have been fairly incurred. But as to future costs, there can be no claim upon the bankrupt's estate; and the creditor, if he chooses to pursue his suit, must do so at the peril of losing all his costs, if the bankrupt obtains his discharge. But if the creditor chooses at once to come in under the bankruptcy, and to prove his debt, I should not hesitate to decree him a priority of satisfaction of the costs already incurred out of the assets before the debts of any of the creditors. I shall direct a certificate to be accordingly sent to the district court in answer to the question propounded for the consideration of this court.

The following order was accordingly sent:

Circuit Court of the United States, Massachusetts District. In Bankruptcy. In the Matter of John S. Foster, Petitioner. April 30th, 1842. Upon the question certified and ordered to be adjourned into this court by the district court, to be heard and determined in this court. It is hereby ordered and decreed to be certified to the district court, as follows: That the said William Appleton ought not to be permitted to proceed further upon and under his suit and attachment named in the petition and answer, except subject to and under the directions of the district court, until the further order of the district court, after it shall have been ascertained by a decree therefor, that he, the said Foster, is a bankrupt, entitled to the benefit of the bankrupt act; and after it shall also have been ascertained, whether the said Foster is or shall, as such bankrupt, be entitled to a certificate

of discharge from all his debts provable under such bankruptcy. And that an injunction ought forthwith to issue from the district court against the said Appleton, and his agents for this purpose. And that in the intermediate time, and until the further order of the district court, the said Appleton is to be at liberty to enter his said suit in the proper state court, and to continue the same therein, taking no step, that shall prejudice the rights of the said Foster, or of his creditors, until the further order of the district court, so as to preserve, if he elects so to do, his attachment in the premises, to abide the final event of the proceedings in bankruptcy, as to the certificate of discharge of the bankrupt.